UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHAEL R. MOORE,

                    Plaintiff,

        v.                                          Case No. 24-cv-299-pp

HOWARD C. MARTIN,

                    Defendant.

**ORDER GRANTING DEFENDANTS' UNOPPOSED MOTION FOR SUMMARY JUDGMENT (DKT. NO. 26) AND DISMISSING CASE**

Plaintiff Michael R. Moore, who is representing himself, is proceeding under 42 U.S.C. §1983 on an Eighth Amendment claim against a doctor at Racine Correctional Institution, where he was incarcerated when he filed this lawsuit. The defendant has moved for summary judgment. Dkt. No. 26. The plaintiff did not respond to the motion, and his deadline for responding has passed. The court will grant the defendant's unopposed motion and dismiss this case.

**I.      Facts**

        A.      Procedural Background

On March 6, 2024, the court received the plaintiff's complaint alleging that Dr. Howard C. Martin was deliberately indifferent to the plaintiff's long-term knee and back pain. Dkt. No. 1. At the time he filed the complaint, the plaintiff was confined at Racine Correctional Institution. Id. at 1. The court screened the

complaint and allowed the plaintiff to proceed on an Eighth Amendment claim against Dr. Martin. Dkt. No. 7.

The defendant responded to the complaint, dkt. no. 14, and on July 9, 2024, the court issued a scheduling order setting deadlines for the parties to complete discovery and file dispositive motions, dkt. no. 15. That day—July 9, 2024—the court mailed the scheduling order to the plaintiff at an address on Cork Bend Drive in Indianapolis.[1] This order was not returned to the court. But ten days later, the court received from the plaintiff a notice that his address had changed; he provided a new address on Newberry Court in Indianapolis. Dkt. No. 16. The docket shows that on July 22, 2024, court staff re-sent the scheduling order to the plaintiff at the Newberry Court address. See Dkt. No. 15 (docket entry). About a month later, defense counsel notified the court that discovery requests she had sent to the plaintiff at the Newberry Court address had been returned to her with a notation that the address was "vacant." Dkt. No. 17 at 1. About two weeks after that—on September 6, 2024—the court received back the scheduling order it had sent to the plaintiff at the Newberry Court address; the returned order bore the notation "Return to Sender Vacant Unable to Forward." Dkt. No. 20.

---

[1] Before mailing the July 9, 2024 scheduling order, the court's staff checked the Wisconsin Department of Corrections Locator website and learned that a week earlier, on July 2, 2024, the defendant had been released from custody. Appsdoc.wi.gov/lop/details/detail (for Moore, Michael R., D.O.C. #557516). The defendant's state probation officer provided the court with the Cork Bend Drive address.

On September 18, 2024, the court issued an order to show cause requiring the plaintiff to provide his current address and inform the court whether he wished to proceed with case. Dkt. No. 21. The defendant's probation officer again had provided the court with the Cork Bend Drive address, so the court sent the order to show cause to that address. Id.at 2. The court warned the plaintiff that if he did not respond to the order to show cause by October 18, 2024, or if the order was returned as undeliverable, the court would dismiss the case without further notice. Id. at 3. The court mailed this order to the plaintiff at only the Cork Bend address because the mail it had sent to the Newberry Court address had been returned. Id. (docket notification).

The same day the court issued that order, defense counsel filed a letter informing the court that she had spoken with the plaintiff, who had "explained that he had difficulty setting up his mailbox at his new apartment, resulting in his mail being returned to sender and his apartment marked as vacant." Dkt. No. 22. Counsel informed the court that the plaintiff had told her that he was "now receiving mail" at his new apartment on Newberry Court. Id. The next day, the court resent the September 18, 2024 order to show cause to the plaintiff at the Newberry Court address. See Docket Entry of Sept. 19, 2024. At the October 18, 2024 deadline, the court received a letter from the plaintiff confirming his address on Newberry Court and asking the court not to dismiss the case. Dkt. No. 23. On October 23, 2024, the court discharged the show-

cause order and issued new deadlines for the parties to complete discovery and file motions for summary judgment. Dkt. No. 24.

On April 17, 2025, the court received from the plaintiff a motion for an extension of time. Dkt. No. 25. The plaintiff told the court that he was detained at the Marion County Adult Detention Facility in Indianapolis, and he asked the court to send mail to his mother at her address in Plainfield, Illinois. Id. at 1. The next day—April 18, 2025—the court received the defendant's motion for summary judgment. Dkt. No. 26. On April 22, 2025, the court issued an order requiring the plaintiff to respond to the defendant's summary judgment motion by the end of the day on May 19, 2025. Dkt. No. 30. The court advised the plaintiff,

> [i]f the court has not received the plaintiff's written response in opposition to the defendant's summary judgment motion by May 19, 2025, the court has the authority to treat the defendant's motion as unopposed, accept all facts the defendant asserts as undisputed and decide the motion based only on the arguments in the defendant's brief, without any input from the plaintiff. That means the court likely will grant the defendant's motion and dismiss the case. Because the plaintiff has a history of failing to file documents by deadlines the court has set, the court also has the authority to dismiss the case as a sanction for plaintiff's failure to timely file a response in opposition to the motion for summary judgment. See Civil L.R. 56(b)(9).

Id. at 2.

The court also denied the plaintiff's motion for an extension of time, observing that the plaintiff had not specified which deadline or deadlines he was asking the court to extend, and the deadline for the parties to complete discovery had passed over a month earlier. Id. at 2–3. Although the court denied the motion, the court gave the plaintiff permission to file a combined

response to the defendant's motion for summary judgment and his own motion for summary judgment by the same May 19, 2025 deadline. Id. at 3. The court denied the plaintiff's request to send mail to him at his mother's address "because that is not *his* address and because his mother is not a party in this lawsuit." Id. Instead, the court sent the order to the plaintiff at the Marion County Adult Detention Facility and reminded the plaintiff to update his address with the court if he was released or transferred to a different facility. Id.

At the May 19, 2025 deadline, the court received a motion from the plaintiff, asking the court to extend his time to respond to the defendant's motion for summary judgment. Dkt. No. 31. The plaintiff told the court that on April 30, 2025, he had been released from the Marion County Adult Detention Facility and that he needed additional time to work on his case. Id. at 1. He stated that he was back at his apartment on Newberry Court and asked the court to again send mail to that address. Id. at 2. On May 21, 2025, the court granted the plaintiff's motion and extended to June 18, 2025 his deadline to respond to the defendant's motion for summary judgment. Dkt. No. 32. The court sent that order to the plaintiff at the Newberry Court address, where it had sent previous orders and where the plaintiff's May 19, 2025 letter said he again was residing. Id. (docket entry).

The June 18, 2025 deadline passed over a month ago, and the court has not received the plaintiff's response to the defendant's motion or another request for an extension of his deadline. Id. Nor has the May 21, 2025 order

been returned to the court as undeliverable. The court has no reason to believe the plaintiff did not receive that order extending his response deadline to June 18, 2025.

On July 2, 2025, defense counsel filed a letter pointing out that that the plaintiff had "not filed any opposition to Dr. Martin's motion, which has now been pending for nearly three months." Dkt. No. 33. Counsel asked the court to dismiss the case with prejudice under Civil Local Rules 41(c) and 56(b)(9) (E.D. Wis.) and Federal Rule of Civil Procedure 41(b). Dkt. No. 33.

The court will not sanction the plaintiff for his failure to respond to the defendant's motion (which means it will not dismiss the case for that reason). But the court will enforce the April 22, 2025 order, consider the defendant's proposed facts to be undisputed and consider the assertions in the defendant's brief to be unopposed for purposes of this decision.

B.    Factual Background

1.    *The Complaint*

The court summarized the plaintiff's claim in the screening order:

> The plaintiff alleges that he has suffered long-term pain in his knee and back, initially caused by a fall in April 2022. He alleges that he received helpful treatment at other facilities in 2022 and 2023, but that he has not received the same level of care at Racine from Dr. Martin. He says that Dr. Martin denied him a knee brace he had been promised and insisted they focus on the plaintiff's back injury, even after the plaintiff repeatedly complained about severe pain in his knee. Dr. Martin scheduled the plaintiff for an MRI, which revealed a torn meniscus in his knee. But allegedly he then refused to schedule surgery for that injury and instead suggested conservative measures that the plaintiff complained did not help. Dr. Martin referred the plaintiff to a specialist but then ignored the specialist's recommendations for other treatment. The plaintiff alleges that Dr. Martin continues to ignore his complaints and

6

recommend ineffective measures to treat his pain, which has only worsened.

Dkt. No. 7 at 6–7.

>    2.    *The Defendant's Undisputed Facts*

At all relevant times, the plaintiff was incarcerated at Racine Correctional Institution. Dkt. No. 28 at ¶7. Dr. Martin is a neuroscientist and is licensed as a medical doctor in Wisconsin. Id. at ¶9. Dr. Martin states that he is not an orthopedic surgeon or neurosurgeon, but that `he "is proficient in treating pain complaints involving the knees and back." Id. at ¶12. He says that he makes referrals for offsite appointments but is not responsible for scheduling appointments. Id. at ¶13.

>    a.    The Plaintiff's Medical History

The plaintiff has a history of medical ailments beginning with a diagnosis of Crohn's disease when he was fourteen years old. Id. at ¶16. Having Crohn's led to complications, including gastrointestinal bleeding from the use of nonsteroidal anti-inflammatory drugs (NSAIDs) and rheumatoid arthritis. Id. at ¶¶17, 20. The plaintiff took the medications Humira and Methotrexate for these conditions. Id. at ¶¶18, 21. The plaintiff also suffered from hypertension, chronic pain, left knee pain, lumbar radiculopathy and other ailments. Id. at ¶23.

While incarcerated at other correctional facilities, the plaintiff received treatment for cramping, back pain and joint pain. Id. at ¶¶24–29, 33–34, 37–38. A specialist diagnosed his knee pain as caused by spondyloarthropathy, an inflammatory disease. Id. at ¶¶30–32. In September 2021, while incarcerated at Oshkosh Correctional Institution, the plaintiff complained of back pain after

hearing "a pop" when turning his body. Id. at ¶39. Medical officials treated his pain with acetaminophen, Cyclobenzaprine, Lidocaine and physical therapy. Id. In April 2022, another specialist reaffirmed his diagnosis of spondyloarthropathy. Id. at ¶40. Three days later, the plaintiff complained of knee pain and requested a brace, but medical staff provided conservative treatments including rest, ice and a mix of pain medications, rubs and cream. Id. at ¶41. An x-ray of the plaintiff's knee revealed no abnormalities. Id. at ¶42. In September 2022, the plaintiff was transferred to Kenosha Correctional Center, where he received a knee brace. Id. at ¶43. An offsite rheumatologist soon after administered a cortisone injection for knee pain. Id. at ¶44. In December 2022, the plaintiff underwent an MRI, which revealed a tear of his medial meniscus, loss of cartilage and other issues. Id. at ¶46.

On March 14, 2023, the plaintiff was transferred to Racine. Id. at ¶47. He had prescriptions of Humira for Crohn's and joint pain, Celebrex for joint pain, Dicyclomine for Crohn's, HCTZ[2] for hypertension and Nortriptyline for pain. Id. In April 2023, the plaintiff saw Melinee Burnett, a neurosurgical spine specialist at Aurora Pleasant Prairie, who ordered an MRI of the plaintiff's lumbar back area after the plaintiff "slipped on wet steps" but "did not fall and caught himself." Id. at ¶48; Dkt. No. 29-1 at 48. Burnett recommended proactive interventions while the plaintiff awaited the results of the MRI,

_____

[2] HCTZ is an acronym for Hydrochlorothiazide, which is used to treat hypertension. See Hydrochlorothiazide (oral route), MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/hydrochlorothiazide-oral-route/description/drg-20071841 (last updated July 31, 2025).

including weight maintenance, yoga, chiropractic treatment and other non-medical options. Dkt. No. 29-1 at 53.

b.     Dr. Martin's Treatment of the Plaintiff

On June 1, 2023, Dr. Martin saw the plaintiff for the first time to address his complaints of left knee pain. Dkt. No. 28 at ¶52. Before this visit, Dr. Martin reviewed the plaintiff's medical history and his physical from July 15, 2021, which detailed the plaintiff's knee issues and provided his Crohn's diagnosis. Id. at ¶50. He also reviewed the plaintiff's MRI results and his list of medications. Id. at ¶51. During the appointment, Dr. Martin noted that the MRI showed a meniscus tear in the plaintiff's knee and cartilage degeneration. Id. at ¶53. He avers that a torn meniscus is often treated with non-surgical intervention, including rest, ice, compression and pain relief. Id. at ¶54. Dr. Martin examined the plaintiff's knee and found that he had normal flexion, joint tenderness and excess water in his knee. Id. at ¶55. He discontinued the plaintiff's Nortriptyline prescription and switched him to Duloxetine to address the plaintiff's back and knee pain. Id. at ¶56. He also prescribed acetaminophen and advised the plaintiff on strategies to work toward losing weight to combat his obesity. Id. at ¶58.

On June 20, 2023, the plaintiff saw Dr. Martin for a follow-up for his knee and back pain. Id. at ¶59. Dr. Martin noted that the plaintiff had not yet undergone an MRI on his back and "was ambulating as much as he could." Id. Dr. Martin examined the plaintiff and determined that he had gained weight, had poor posture and was tender along the lumbar area of his spine. Id. at

¶60. He also examined the plaintiff's knee and found no changes from the previous examination. Id. at ¶61. He showed the plaintiff stretching exercises for his back pain and encouraged him "to lose weight and take stress off of his joints and spine." Id. at ¶62. He did not add new prescriptions and advised the plaintiff to follow up in three months. Id. at ¶63.

On July 10, 2023, the plaintiff saw Dr. Martin for a follow-up. Dkt. No. 29-1 at 23. The plaintiff reported that he was "doing well" and had no new complaints. Id. He still had not undergone an MRI on his back. Id. The next day, Dr. Martin renewed the plaintiff's prescription for Celebrex to address his pain. Dkt. No. 28 at ¶64. Martin notes that although Celebrex is an NSAID, it is considered safe for patients with Crohn's disease. Id. at ¶65. On August 16, 2023, Dr. Martin renewed the plaintiff's prescription for acetaminophen. Id. at ¶66.

On September 26, 2023, Dr. Martin again saw the plaintiff for a follow-up. Id. at ¶67. The plaintiff did not complain of knee pain during this visit. Id. at ¶68. He did complain of back pain, but he also admitted that he had not taken his prescribed Duloxetine in one month. Id. at ¶69. Dr. Martin determined that the plaintiff had lost weight but continued to show poor posture and spine tenderness. Id. at ¶70. He encouraged the plaintiff to take his Duloxetine and all prescribed medications, explained that the plaintiff's lumbar MRI appointment was coming up and recommended that the plaintiff follow up in one month. Id. at ¶71.

On October 5, 2023, Dr. Martin received a message from medical staff notifying him that a provider at a different facility had placed an order for an orthopedic consultation for the plaintiff in December 2022, but that the appointment never was scheduled. Id. at ¶72. The staff member asked if this consultation was "still necessary" and asked Martin to cancel the order if not. Dkt. No. 29-1 at 16. Dr. Martin avers that based on his professional judgment and treatment of the plaintiff's current complaints, he discontinued the order. Dkt. No. 28 at ¶73. He instead opted to continue treating the plaintiff with pain medications and weight loss strategies. Id. at ¶74. He also again renewed the plaintiff's Celebrex prescription. Id. at ¶75.

On October 26, 2023, Dr. Martin again saw the plaintiff to review his lumbar MRI results and discuss his concerns of back pain. Id. at ¶76. The plaintiff did not complain about knee pain during this appointment. Id. at ¶77. Dr. Martin reaffirmed his observations of the plaintiff's weight and spine tenderness, and he explained that the lumbar MRI showed spinal stenosis at multiple levels of the plaintiff's lumbar spine area. Id. at ¶¶78–79. Dr. Martin explains that spinal stenosis is a condition where the spaces within the spine narrow, putting pressure on the spinal cord and nerve roots and causing pain. Id. at ¶80. He avers that like a torn meniscus, spinal stenosis commonly is managed with non-surgical treatment, including pain relief. Id. at ¶81. Dr. Martin ordered a "high priority referral" to an offsite neurosurgical specialist to address the plaintiff's spinal stenosis. Id. at ¶82. He continued the plaintiff's medications and advised him to follow up in three months. Id. at ¶83.

11

On November 13, 2023, the plaintiff returned to Aurora Pleasant Prairie to see Burnett about his lumbar spine MRI results. Id. at ¶84. She noted that his clinical presentation was consistent with the spinal stenosis shown on his MRI. Id. Burnett recommended interventions including light core strengthening exercises, hydration, weight management, yoga, meditation, stress reduction, rest, topical anesthetics and ice/heat. Id. at ¶85. She did not recommend injections or surgery. Id. at ¶¶86–87. She advised the plaintiff to follow up if his symptoms did not improve or worsened. Dkt. No. 29-1 at 46.

When the plaintiff returned to Racine, he asked the prison to end his recreation restriction, and Dr. Martin approved the request. Dkt. No. 28 at ¶88. Dr. Martin also refilled the plaintiff's acetaminophen prescription. Id. at ¶89. On November 16, 2023, Nurse Cindy Street sent Dr. Martin an email noting that the plaintiff had requested "a nerve pain med such as lyrica or gabapentin for [his] nerve pain from nerve damage and pain to [his] knee." Id. at ¶90; Dkt. No. 29-1 at 13. Dr. Martin advised Nurse Street that medications like Gabapentin and Pregabalin (Lyrica) no longer were advised for chronic use because "they make the pain worse." Dkt. No. 29-1 at 13; Dkt. No. 28 at ¶91. Dr. Martin elaborates that "studies have shown that those medications make the pain worse over time and provide little to no pain relief relative to the side effects of the medication." Dkt. No. 29 at ¶29; see Dkt. No. 29-3 (studies attached to Dr. Martin's declaration). On January 3, 2024, Dr. Martin renewed the plaintiff's Celebrex prescription. Dkt. No. 28 at ¶94. On February 12, 2024, he again renewed the plaintiff's acetaminophen prescription. Id. at ¶95.

On March 14, 2024, Dr. Martin saw the plaintiff for the final time about the plaintiff's complaints of lower back pain. Id. at ¶96. Dr. Martin avers that the plaintiff did not complain about knee pain during this appointment. Id. at ¶97. Dr. Martin noted that the plaintiff had gained weight, but that his posture had improved. Id. at ¶98. Dr. Martin explained to the plaintiff that the plaintiff was not a candidate for lumbar surgery to address his spinal stenosis because Burnett had not recommended it, and the plaintiff was scheduled to be released from Racine before medical staff could approve and schedule the surgery. Id. at ¶99. Dr. Martin prescribed pain creams for the plaintiff to apply as needed in addition to his medications. Id. at ¶100. He advised the plaintiff to increase his exercises and follow up with his primary care provider in three months. Id.

On April 1, 2024, Dr. Martin renewed the plaintiff's prescription for topical gel for his pain. Id. at ¶101. The next day, he renewed the plaintiff's prescription for Celebrex. Id. at ¶102. Dr. Martin had no further involvement in the plaintiff's care or treatment. Id. at ¶103.

Dr. Martin avers that he always gave the plaintiff an opportunity to express his concerns or complaints during appointments, and that he provided care based on his years of training, experience and medical judgment. Dkt. No. 29 at ¶39. He reiterates that he was not responsible for scheduling the plaintiff's lumbar MRI, which had been scheduled before Dr. Martin began treating the plaintiff. Id. at ¶41. He reiterates that Burnett did not recommend surgery for the plaintiff's back pain and instead recommended physical exercises, rest and

other conservative treatments. Id. at ¶42. Dr. Martin avers that this was consistent with his treatment of the plaintiff's pain, and that he made similar future recommendations. Id. He avers that he provided care and treatment for all the plaintiff's medical issues within the standard of care. Id. at ¶43.

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

### B. Legal Standards

As the court explained in the screening order, the Eighth Amendment governs the plaintiff's claim that Dr. Martin was deliberately indifferent to his

14

pain during the time he treated the plaintiff at Racine. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id. In the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff to show that his medical need constituted a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)). "A medical condition is deemed to be serious if it may be 'life threatening or pose[s] a risk of needless pain or lingering disability if not treated at once.'" Karraker v. Peters, 65 F.3d 170 at *3 (7th Cir. 1995) (citing Davis v. Jones, 936 F.2d 971, 972 (7th Cir. 1991)).

To satisfy the subjective component, the plaintiff must demonstrate that the defendant had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" Stewart, 14 F.4th at 763 (quoting Huber v. Anderson, 909 F.3d 201, 208 (7th Cir. 2018)).

To prove a claim of deliberate indifference against a medical provider, the subjective component requires the plaintiff to show that the medical professional's treatment decisions were "so inadequate that it demonstrated an absence of professional judgment." Stewart, 14 F.4th at 763 (quoting Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)). Put another way,

> "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" [*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)] (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Id.

C.    Analysis

No reasonable jury reviewing this evidence could find that Dr. Martin was deliberately indifferent to the plaintiff's knee and back pain. There is no dispute that the plaintiff's pain was objectively serious. But the undisputed facts show that Dr. Martin treated the plaintiff's pain for about ten months. During that time, he offered conservative treatments, encouraged the plaintiff to lose weight to reduce stress on his back and joints and provided medications as needed. He first reviewed the MRI of the plaintiff's knee, determined that he had a meniscus tear that did not require surgery and adjusted his medications to address the plaintiff's pain. The plaintiff later said he was "doing well" and did not complain of knee pain during some follow-up appointments. Dr. Martin also addressed the plaintiff's back pain, reviewed his lumbar spine MRI and

16

referred him to an offsite spine specialist. He reminded the plaintiff to take all prescribed medications to address his pain. The specialist did not suggest injections or surgery, so Dr. Martin continued to provide conservative, non-surgical care in line with the specialist's recommendations. Dr. Martin avers that the interventions he prescribed commonly are used for patients suffering from the same conditions as the plaintiff, and that there is no evidence suggesting otherwise. These reasoned medical decisions do not demonstrate deliberate indifference. See Zaya v. Sood, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

The undisputed evidence also dispels the claims the plaintiff raised in his complaint. The plaintiff first alleged that Dr. Martin refused to send the plaintiff for a consultation about knee surgery that was scheduled before he arrived at Racine. The plaintiff likely is referring to the orthopedic consultation that Dr. Martin cancelled in October 2023. "A prison physician is not required to authorize a visit to a specialist in order to render constitutionally acceptable medical care." Pyles, 771 F.3d at 411. A provider's cancellation of a specialist referral "supports a claim of deliberate indifference only if that choice is 'blatantly inappropriate.'" Id. (quoting Roe v. Elyea, 631 F.3d 843, 858 (7th Cir. 2011)). Deciding not to send a patient to a specialist may be blatantly inappropriate "if the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person." Id. at 412.

17

The evidence does not support a finding that Dr. Martin's decision was blatantly inappropriate. There is no evidence suggesting that surgery would have been recommended if the plaintiff had gone for the consult. The plaintiff's referral was from December 2022, ten months before staff notified Dr. Martin about it. Dr. Martin avers that although he is not an orthopedic surgeon, he is proficient at treating knee pain and knee issues. The evidence shows that before being notified of the consult request, Dr. Martin reviewed the plaintiff's MRI, evaluated his knee and established a treatment plan. He states that he cancelled the consultation based on his evaluation and the plaintiff's latest concerns and treatment history. No reasonable jury viewing this evidence would conclude that by cancelling the orthopedic consult, Dr. Martin failed to exercise his medical judgment and chose a treatment path that "no minimally competent professional would have [taken] under those circumstances." Stewart, 14 F.4th at 763 (cleaned up).

The plaintiff alleged that Dr. Martin denied him a promised knee brace, told the plaintiff that they would focus on his back because "'[t]he back is more important'" and ignored his continued complaints about knee pain. Dkt. No. 7 at 4–5 (quoting Dkt. No. 1 at 5). But the undisputed facts show that the plaintiff received a knee brace in September 2022, before he was at Racine and before Dr. Martin treated him. There is no evidence that he requested a brace again while at Racine. Dr. Martin reviewed the plaintiff's knee MRI before their first appointment and adjusted medications to address the plaintiff's complaints about pain. The plaintiff did not raise concerns about his knee

during follow-up appointments with Dr. Martin in July, September and October 2023 or March 2024 and instead reported that he was "doing well" after their initial consultation. There is no evidence suggesting that Dr. Martin disregarded or ignored the plaintiff's complaints of knee pain. That the plaintiff may have continued to experience pain after Dr. Martin began treating him does not mean that Dr. Martin was deliberately indifferent to his pain. See Arce v. Wexford Health Sources Inc., 75 F.4th 673, 681 (7th Cir. 2023) (citing Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996)) (explaining that the Eighth Amendment does not "impose the unrealistic requirement that doctors keep patients completely pain-free").

The complaint alleged that the plaintiff's lumbar MRI was delayed several months "because referral appointments are 'first come first serve.'" Id. at 5 (quoting Dkt. No. 1 at 5). The undisputed facts show that Dr. Martin was not treating the plaintiff when Burnett ordered the lumbar MRI in April 2023. And even if he was, it is undisputed that Dr. Martin was not responsible for scheduling appointments, like the plaintiff's MRI. He cannot be held liable for alleged failure to perform acts outside of his professional duties. See Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009) ("[N]o prisoner is entitled to insist that one employee do another's job."); Walker v. Benjamin, 293 F.3d 1030, 1038 (7th Cir. 2002) (explaining that medical professionals are not liable for delays that are outside of their control).

The complaint then alleged that the results of the plaintiff's lumbar MRI showed "that he 'needed surgery ASAP,'" but that Dr. Martin "instead referred

the plaintiff to a neurosurgeon at a nearby hospital," then disregarded "'the specialist's directions or recommendations'" for epidural injections. Dkt. No. 7 at 5 (quoting Dkt. No. 1 at 5–6). The undisputed facts show this is not what happened. Dr. Martin reviewed the plaintiff's lumbar MRI and determined that he had spinal stenosis, which could be treated with non-surgical interventions. He referred the plaintiff to Burnett (the "neurosurgeon"), who confirmed that the MRI showed spinal stenosis. But Burnett did *not* recommend surgery or injections. Instead, she recommended non-surgical interventions including exercises, yoga, weight management and rest. There is no evidence that any specialist recommended surgery or injections or that Dr. Martin disregarded a specialist's recommendations for those interventions.

The undisputed evidence would not allow a reasonable jury to find that Dr. Martin disregarded the plaintiff's knee and back pain, followed an ineffective course of treatment or ignored specialist's recommendations for surgery or other interventions. The undisputed facts show that Dr. Martin provided conservative treatment based on his examinations and the plaintiff's symptoms and referred the plaintiff to a spine specialist, who agreed with Dr. Martin's prescribed course of treatment. There is no evidence that Dr. Martin failed to exercise his medical judgment while treating the plaintiff's pain. Dr. Martin is entitled to judgment as a matter of law, and the court will grant his motion.

## III. Conclusion

The court **GRANTS** the defendant's unopposed motion for summary judgment. Dkt. No. 26.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **thirty days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion in *this court.* See Fed. R. App. P. 24(a)(1). The Court of Appeals may assess the plaintiff a "strike" if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **twenty-eight days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more

21

than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 31st day of July, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**